IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal No. 1:20-MJ-00212 |
| v. | ) |
| | ) |
| GARY L. COOPER, | ) |
| | ) |
| Defendant. | ) |

## STATEMENT OF FACTS

The United States and the defendant, GARY L. COOPER (hereinafter "COOPER" or the "defendant"), agree that the United States would have proven the following facts at trial, beyond a reasonable doubt, with admissible and credible evidence:

1. On or about November 26, 2018, in Fredericksburg, Virginia, within the Eastern District of Virginia, the defendant, did knowingly sell in interstate commerce an endangered species of wildlife listed pursuant to Title 16, United States Code, Section 1533, to wit, two pieces of carved elephant ivory.

2. Specifically, on or about November 17, 2018, COOPER offered to sell a Fish and Wildlife Service Special Agent acting undercover (referred to below as "UC2") four ivory pieces for a total of $8,125. Subsequently, on or about November 26, 2018, this undercover law enforcement agent purchased two pieces of ivory for $1,150, sending payment to COOPER's PayPal account. COOPER thereafter caused the two ivory items to be shipped in interstate commerce from Fredericksburg, Virginia to an address in Bellmore, New York.

3. On or about July 21, 2019, a forensic scientist at the Fish and Wildlife Service's National Wildlife Forensics Laboratory confirmed that the items COOPER sold the undercover law enforcement agent on or about November 26, 2018 were made from genuine elephant ivory.

4.      The Endangered Species Act was enacted to provide a program for the conservation of endangered and threatened species. Under the ESA, the terms "endangered species" or "threatened species" include any species, or part thereof, included on the "List of Endangered or Threatened Wildlife," found in 50 Code of Federal Regulations ("C.F.R.") Part 17.11.

5.      Pursuant to 16 U.S.C. §§ 1538(a)(1)(E), 1540(b), the ESA makes it unlawful for any person to knowingly deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any endangered species. Pursuant to 16 U.S.C. §§ 1538(a)(1)(F), 1540(b), the ESA makes it unlawful for any person to sell, or offer for sale, any endangered species in interstate commerce. Pursuant to 16 U.S.C. 1538(a)(1)(G), the prohibitions that apply to any endangered species outlined under 16 U.S.C. 1538(a)(1) also apply to any threatened species.

6.      Asian elephants (*Elephas maximus*) are listed as "endangered" under 50 C.F.R. 17.11 and have been so listed since 1976. See Federal Register ("FR") Notice 41 FR 24062. African elephants (*Loxodonta africana*) are listed as "threatened" under 50 C.F.R. 17.11 and have been so listed since 1978. See 43 FR 20499 (1978) and 50 CFR 17.40(e).

7.      Sperm whales (*Physeter macrocephalus*) are listed as "endangered" under 50 C.F.R. 17.11 and have been so listed since 1970. See 35 FR 8491 (1970).

8.      Pursuant to 16 U.S.C. § 3372(a)(1), the Lacey Act makes it unlawful for a person to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife, taken, possessed, transported, or sold in violation of any United States law or treaty of the United States

9.      The word "ivory" traditionally describes the tusks of elephants. However, the chemical structure of the teeth and tusks of mammals is the same regardless of the species of

2

origin, and the trade in certain teeth and tusks other than elephant is well established and widespread. Therefore, "ivory" can correctly be used to describe any mammalian tooth or tusks of commercial interest which is large enough to be carved or scrimshawed. However, most commercialized ivory found throughout the world is made from elephant tusks. In recent years the illegal ivory trade has driven a dramatic increase in African elephant poaching, threatening the very existence of elephants in Africa.

10. It is extremely difficult to differentiate legally acquired ivory from ivory derived from elephant poaching or ivory smuggling. It is extremely difficult to determine the age of ivory without conducting scientific testing. Individuals who advertise ivory to be antique without providing any provenance or authenticity documentation often do so in a misleading attempt to minimize their unlawful activity and dissociate it from the current elephant poaching crisis.

11. In June 2015, an undercover FWS Special Agent ("UC1") received information regarding a New York Craigslist advertisement by defendant COOPER that offered the sale in Fredericksburg, Virginia, of numerous items that appeared to be made from ivory. UC1 discovered that COOPER had at least four Craigslist postings, all of which offered the sale of ivory items. UC1 reviewed the Craigslist advertisements and discovered that COOPER had listed for sale approximately 92 individual carvings appearing to be made in whole, or in part, from ivory. Most of the carvings appeared to be carved from elephant ivory. The ivory items ranged in size from smaller netsukes to a partially-carved, full elephant tusk that measured approximately 25 inches long. In addition to the elephant ivory carvings, the advertisements offered for sale two raw sperm whale teeth and one scrimshawed sperm whale tooth.

3

12.     On June 11, 2015, UC1 initiated covert contact with COOPER via email by responding to the Craigslist advertisement. During the contacts, COOPER told UC1 via email that he was helping elderly friends sell off their large collection of "fine and rare carvings and other Antiques due to serious illnesses and medical expenses." COOPER indicated that the items were selling quickly and that he would be relisting additional ivory pieces in the future. COOPER also wrote that he would ship ivory anywhere within the U.S., that he would only accept payment via PayPal, and that the pieces came with no provenance or documentation.

13.     On June 30, 2015, UC1 placed a recorded phone call to COOPER at the number he provided. During the call, COOPER made statements that suggested he was fully aware it was illegal to sell ivory in interstate commerce. COOPER stated that he had already sold and shipped items to interstate buyers without issues. COOPER stated that he personally packs each item, and explained that, aside from him and the buyer, no one knows what is being shipped. UC1 mentioned to COOPER that the interstate sale of ivory was banned at the federal level. COOPER indicated that he was willing to sell ivory in interstate commerce anyway, since the items were older pieces.

14.     COOPER stated that online payment would be accepted in the form of PayPal only. The only exception would be that cash could be used for in-person transactions. COOPER stated that during the week prior, several Chinese buyers came up from Richmond, Virginia, to purchase ivory and paid using cash. COOPER told UC1 that he recently sold approximately 70 whale teeth to a buyer from Oregon. UC1 expressed concern about using PayPal because of the traceability of an ivory transaction. COOPER advised that it would be best to have any communication over the phone, and that PayPal descriptions could be listed as a "service transaction," indicating the payment was for a "service."

4

15.     As a result of a reassignment within the Fish and Wildlife Service, UC1 did not make any purchases from COOPER or engage in further communications with him.

16.     On September 20, 2018, a second undercover FWS Special Agent ("UC2") received information about a Craigslist advertisement offering for sale two uncarved, raw elephant tusks mounted on wooden bases. The advertisement was listed in the Manhattan, New York Antiques section of Craigslist, but indicated that the items were actually being sold out of Fredericksburg, Virginia. The Craigslist advertisement (Posting #6691248675) stated that the tusks measured 28 inches long, with an asking price of $6,500. The advertisement looked very similar to the advertisements observed in 2015 by UC1, to include language that explained the items were part of an "Estate" sale and belonged to an elderly couple in poor health.

17.     On September 20, 2018, UC2 initiated email contact with COOPER via email. In the email, UC2 stated that he was from New York and asked for more photographs and information on the tusks. COOPER responded via email said he would provide more information on the tusks after he spoke with the "Estate owners." COOPER sent two additional emails containing 32 photographs of approximately 50 various ivory pieces he was selling. The pieces included small netsukes (small carved ornaments used in traditional Japanese dress, such as a kimono), larger carved statues, and a partially-carved, full elephant tusk that measured approximately 25 inches long.

18.     On September 21, 2018, COOPER and UC2 traded emails in which UC2 asked for pricing, authenticity paperwork, and appraisals for the photographed pieces sent by COOPER the previous day. COOPER responded and stated that he was helping an elderly couple sell off their ivory pieces. COOPER wrote:

> the Estate owners kept notes of most of their purchases so they know when they bought and what they paid but that's all they have now. But

> these rare Ivories were brought here for centuries legally by tourists and
> military men and women without papers or any type of documentation so
> that's just the situation when buying 90 percent of these Antique Ivories.

In a separate email, COOPER explained that many of the ivory pieces were purchased "30 to 40 years or more ago" and that although the estate owners once had several pieces appraised, they no longer had much of the appraisal paperwork.

19. On September 24, 2018, COOPER emailed UC2 with a detailed pricing list for approximately 30 pieces of carved ivory. In the email, COOPER offered to sell those 30 pieces for a total of approximately $34,325. In a separate email received by UC2 that same day, COOPER wrote that he would only accept payment via PayPal.

20. On October 16, 2018, UC2 emailed COOPER expressing interest in a 25-inch, partially-carved elephant tusk and an ivory censor statue, and asked COOPER if he would ship the pieces to New York.

21. On October 18, 2018, COOPER emailed 12 photographs to UC2 of those two ivory pieces. COOPER sent the photographs via his unique Craigslist email address, and also from his email address.

22. On October 24, 2018, UC2 placed a recorded phone call to COOPER. During the call, COOPER explained that he was selling ivory carvings made from whale teeth or elephant ivory as part of an estate sale and that a majority of the buyers he deals with are antique dealers who are flipping the items for a profit. During the call, COOPER stated that he sold and shipped $30,000 worth of scrimshawed whale's teeth to a man in Oregon. COOPER made statements that demonstrated an understanding of ivory laws and stated that Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") certificates are required for international shipments. COOPER said that he doesn't ship internationally, but that the buyers

6

can if they want to. COOPER then stated that there is "too much risk and too many hassles" with selling and shipping ivory internationally. COOPER reiterated that he would sell and ship ivory in interstate commerce, saying "you have to of course be careful" because "they've cracked down everywhere a little bit" but that shipping domestically "shouldn't be an issue." UC2 twice mentioned that selling ivory in interstate commerce was illegal. COOPER explained that when shipping ivory pieces, he would be discrete. He also stated that the estate owners have a very large collection of ivory and there are many more pieces to sell.

23. On November 17, 2018, COOPER emailed UC2 offering to sell four ivory pieces for a total of $8,125, including shipping and insurance fees. In the email, COOPER stated that he would ship the ivory items to New York via the U.S. Postal Service ("USPS"). The email also contained eight photographs of ivory being offered for sale, including a carved ivory apple (being offered for $475) and a carved ivory Buddha statue (being offered for $600).

24. On November 26, 2018, UC2 sent COOPER's PayPal account $1,150 for the purchase and shipping/handling of the carved ivory apple and the carved ivory Buddha statue. Within the PayPal transaction, UC2 provided COOPER a shipping address in Bellmore, New York.

25. On November 27, 2018, COOPER mailed to UC2 the carved ivory apple and the carved ivory Buddha statute from a post office in Fredericksburg, Virginia.

26. On November 27, 2018, UC2 received an email from COOPER, which stated that, earlier that day, COOPER shipped the two items to UC2 via USPS Priority Mail.

27. On November 30, 2018, the package sent by COOPER on November 27th arrived at the shipping address in Bellmore, New York, where it was picked up by a FWS agent. The agent inspected the package and found it contained the two ivory pieces purchased by UC2. The

agent observed that the outside of the package displayed a hand-written address label that listed COOPER's name and COOPER's residence as the return address.

28. COOPER used an AOL email account to discuss the sale of ivory with potential and future buyers, including emails where COOPER discussed shipping ivory in interstate commerce. COOPER used that email account to corresponded with the online seller eBay regarding federal and international laws that restrict the sale of endangered species, specifically ivory and rhinoceros horn.

29. On January 6, 2019, COOPER emailed UC2 offering to sell him a carved ivory tusk for $5,100, and included 26 photographs of various ivory items he was selling, including photographs of a carved ivory book and a carved ivory village scene.

30. On January 7, 2019, COOPER emailed UC2 stating that the carved ivory book was purchased in 1987 at an auction in Washington D.C. for $425 and that the carved ivory village scene was purchased in 1989 at an auction in Richmond, VA for $175. COOPER offered to sell UC2 the carved ivory book for $650 and the carved ivory village scene for $325.

31. On January 18, 2019, COOPER again offered to sell a carved ivory tusk to UC2 for $5,100, and wrote that an "Asian Antique Dealer," who often travels to Europe, was interested in the tusk as well.

32. On January 23, 2019, UC2 emailed COOPER asking for any appraisal or age paperwork COOPER had for the carved tusk. Later that day, COOPER responded and stated that he had several ivory pieces appraised by Weschler's Auction House in Washington D.C. years ago, but that the tusk in question had not been appraised and came with no paperwork.

33. On February 1, 2019, COOPER sold UC2 the carved ivory book for $550 and the carved ivory village scene for $250.

34. On February 4, 2019, COOPER shipped the ivory book and ivory village scene to UC2, and sent two emails to UC2. The first email stated that earlier that day, COOPER shipped the two items to UC2 via USPS Priority Mail. The second email included a photograph of the package.

35. On February 6, 2019, the package shipped by COOPER on February 4th arrived in Bellmore, New York, where it was picked up by a FWS agent. The agent inspected the package and found it contained the two ivory pieces purchased by UC2.

36. On February 8, 2019, UC2 sent COOPER an email questioning the authenticity of the ivory pieces COOPER sold on February 1st. In an emailed response, COOPER told UC2 that the two items were authentic ivory and that "everything the Estate sells is guaranteed to be genuine ivory." On that same date, COOPER sent UC2 two additional emails where he discussed the intricacy of ivory pricing and attached several dozen photographs of ivory for sale online that were similar to the pieces COOPER sold UC2."

37. On February 11, 2019, COOPER emailed UC2 stating that he was a reputable ivory dealer and that the ivory village scene he sold UC2 was "carved from the outer portion of a large Elephant tusk." COOPER went on to explain that if the piece was a fake made out of bone, "it would have dark hollow sections all throughout the carvings." COOPER then wrote that if the piece was a fake made of resin or another material "it would have seen bubbles or edges in interior areas."

38. On July 21, 2019, a forensic scientist at the FWS National Wildlife Forensics Laboratory confirmed that the items COOPER sold UC2 on November 26, 2018 and February 1, 2019 were all made from genuine elephant ivory.

39. On December 13, 2019, an undercover FWS agent ("UC3") responded to a Craigslist advertisement (Posting #7031199736) found in the "Washington DC Antiques" section of Craigslist that listed Chinese carvings for sale. In the email, UC3 inquired about prices for the carvings and stated that he lived in Maryland.

40. On December 15, 2019, COOPER responded via email stating that he would email UC3 photographs of what he was selling.

41. On December 19, 2019, UC3 received an email from COOPER, containing nine photographs of various ivory items. On that same day, UC3 received a second email from COOPER that contained 10 photographs of various ivory items. Of the 19 photographs, five of the photographs appeared to be screenshots taken on either an Apple iPad or iPhone.

42. On December 20, 2019, COOPER emailed UC3 stating that all the ivory pieces he was offering for sale were legitimate, even stating that within the pieces "You can see the cross hatching graining that is only found in genuine Elephant Ivory."

43. On December 27, 2019, COOPER emailed UC3 detailed pricing and history information on four ivory items. One of the entries described a pair of Chinese ivory vases that COOPER stated were purchased in 1989 for $660. He offered to sell them to UC3 for $480. A second entry described a Chinese ivory bridge that COOPER said was purchased in 1987 for $1,200. He offered to sell it to UC3 for $875.

44. On December 28, 2019, COOPER emailed UC3 stating that he lacked any receipts or provenance for any of the ivory he was offering for sale.

45. On January 6, 2020, COOPER sold UC3 the carved ivory bridge for $875 and the carved ivory vases for $430.

46. On January 7, 2020, COOPER mailed the carved ivory bridge and the carved ivory vases to UC3 from Fredericksburg, Virginia, to Mt. Airy, Maryland. That same day, he sent UC3 an email stating that earlier that day, COOPER shipped the ivory items to UC3 via USPS Priority Mail. In the email, COOPER told UC3 that there was an additional ivory item in the shipment (a small ivory tree) that was part of the ivory bridge. The email also contained two photographs of the USPS shipping receipt.

47. On January 9, 2020, the package shipped by COOPER on January 7th arrived in Mt. Airy, Maryland.

48. On February 3, 2020, COOPER emailed UC3 stating that he will be listing more ivory items for sale this week. In the email, COOPER offered to send photographs of ivory carvings to UC3 and explained that if UC3 wanted to come to the COOPER's residence to purchase the ivory items, that all price negotiations would need to take place prior to the meeting. COOPER wrote that both parties need to "agree on prices for those items before hand because I'm in no position to negotiate prices when the Buyer is here at my home to examine or pickup their purchases."

49. The two ivory pieces that COOPER sold on or about November 26, 2018, were among no less than 50 pieces of elephant ivory, with a total market value of more than $40,000 but less than $95,000, that he sold or offered for sale in the Eastern District of Virginia to undercover law enforcement agents between on or about September 20, 2018, and on or about January 7, 2020.

50. Between on or about September 20, 2018, and on or about January 7, 2020, COOPER sold and transferred to undercover law enforcement agents seven pieces of ivory in

11

exchange for $3,363. For each of these purchases, COOPER caused the items to be shipped from Fredericksburg, Virginia, to addresses in New York and Maryland.

51. The above-referenced items are "endangered species" as defined in Title 16, United States Code, Section 1533.

52. The acts taken by COOPER in furtherance of the offense charged in this case, including the acts described above, were done willfully, knowingly, and with the specific intent to violate the law, and were not committed by mistake, accident or other innocent reason.

53. This statement of facts includes those facts necessary to support the plea agreement between COOPER and the United States. It does not include each and every fact known to COOPER or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding COOPER's case.

54. This statement of facts shall be admissible as a knowing and voluntary confession in any proceeding against COOPER regardless of whether the plea agreement is presented to or accepted by a court. Moreover, COOPER waives any rights that he may have under Fed. R. Crim. P. 11(f), Fed. R. Evid. 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the statement of facts in any such proceeding.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By: _____
Sara A. Hallmark
Alejandra Arias
Special Assistant United States Attorneys

<u>Defendant's Signature</u>: After consulting with my attorney and pursuant to the plea agreement entered into this day between the Defendant, Gary L. COOPER, and the United States, I hereby stipulate that the above statement of facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 4/7/2021

Gary L. COOPER
Defendant

<u>Defense Counsel Signature</u>: I am counsel for the Defendant in this case. I have carefully reviewed the above statement of facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Date: 6/10/21

Caleb Kershner, Esq.
Counsel for Defendant